May it please the Court, my name is Carl Osaki, and I represent the appellant in this appeal, Alexander Blackie Bell. This is the second time we're before the Court on this case, and I'd like to reserve five minutes for rebuttal. But there are several things that remain very clear. Number one is that Hawaiian Airlines understood that the written letters from Mr. Bell are information regarding what his retirement benefits are. That is very clear. It is also clear that Hawaiian Airlines has absolutely no explanation, no reason for the seven-year delay in this case in providing that information to Mr. Bell. The first panel of this circuit determined that, and nothing has changed before this panel. And that is why we're  Breyer. That wasn't the question before the first panel, was it? Osaki. Yes, it was. The question before the first panel was that there was a reason for delay. No, it wasn't. Right. Breyer. Okay. So that question hasn't been resolved by the Court. In fact, I'm not sure that question is relevant today, is it? Osaki. It is not. Breyer. Okay. So let's move to what is relevant. Osaki. What is relevant is whether the district court was wrong in now determining that these letters were not a RISA request for information when this Court already ruled that it had been, and in addition, when all the facts clearly established that these letters were requests for information. Ginsburg. I understand our Court previously ruled that these letters could be interpreted as a request for information and send it back for the trial judge to make that finding a fact. Osaki. I don't think so, Your Honor. I think this Court, in the first opinion, ruled as a matter of law that the two letters in June and October of 1992 were requests for information. And that is because you have to read that opinion in context, too. And the context of that opinion was an appeal from a summary judgment motion. The district court, in the first appeal, ruled that those letters were not requests for information. Mr. Bell's counsel argued as a matter of law that they were. There were no disputed issues of fact for the district court to address in that first summary judgment motion. Breyer. You argued to Judge King that the law of the case was the Ninth Circuit decided these are letters of information. Osaki. Yes. Breyer. He didn't buy that. He said we need to have a trial. What was what evidence did they present, did Hawaiian Airlines present, to show that these were not letters requesting information? Osaki. Nothing, except the bare letters themselves, which this Court, in the first appeal, ruled were requests for information. Breyer. There was no extrinsic – I mean, the letters speak for themselves. There was no extrinsic evidence offered about what was – what was intended by them? Osaki. Well, if you look at the extrinsic evidence, the testimony that was presented, they only support the finding that the letters were requests for information. For example, when Ms. Matsumoto received the October 27th, 1992 letter, the second letter, her testimony was, I understood that that letter referred to the 1990 request for a final calculation of his retirement benefits. She understood that he was requesting a recent information. So if you take the extrinsic evidence outside of these letters, they only buttress and support the original ruling that these letters were requests for information. Roberts. Let's suppose you're right, and we decide we have to reverse this. Do I understand correctly there's still a statute of limitations issue that was never addressed by Judge King? Osaki. Yes. Roberts. So we'd have to go back for – to give the district court the first crack at it? Osaki. Yes. That's not before the Court. Roberts. That then brings up whether you're requested to not go back to Judge King. Could you say a word or two about that? Osaki. Yes. On a reassignment question, the question before the Court is whether sending it back to the same district judge, can that district judge put out of mind his previously expressed views? In this case, we have the first time he expressed a view that these letters were not ERISA letters. Ginsburg. Right. But if we were to send it back, we'd be saying that these letters are both requests for information because they ask for a determination and a request for payment. So we'd be saying that. We'd be saying he clearly erred based on the evidence on that issue. But we'd send it back for the statute of limitations issue. What evidence is there of bias of Judge King on the statute of limitations issue? Osaki. If it's strictly on the statute of limitations, it's none, Your Honor, because he didn't decide the question. He ruled that it was moot. But I think he has already expressed so much antagonism to this case because of his statements about why the case was being pursued to pay the attorneys. I mean, he made some comments about the basically the attorney's fees, tail was wagging the dog. Yes. I mean, judges say that all the time, you know. But you put that in context with the purpose of ERISA, and that was completely ignored. What was also ignored was this Court's ruling in the first opinion that the issue now was the penalty, to address the penalty. And his statements on the record  And I will not get to the penalty issue. I will find these letters to be not the ERISA letters, just as I did the first time. And I think that's the problem with sending it back to the same judge. So you're saying that even if he rules in your favor on the statute of limitations, he will then be ruling further on the damage and attorney's fee aspects, and that's where he's shown bias? One of our concerns, and in our final argument, we were concerned about the discretion that the district court has in assessing the ERISA penalty. And what we did was try to get as many cases as we could possibly find that address penalty issues to circumscribe and define the district court's discretion, because we knew we were going to have an issue with a de minimis finding versus substantial penalties, which the facts of this case clearly deserve. I didn't find any other cases where there was seven years of delay and seven years of unexplained delay. And that's what the problem with this case was. Let me go back to the point in time when you returned from the first you got the first decision from this Court, you returned to the district court. Hawaiian has argued that you did not take the position at that time before the district court that the first Ninth Circuit decision closed the door on the issue that ultimately went to the bench trial. When did you first take the position that there was no point in the bench trial, because that issue had already been resolved by our decision? Well, we did invite the district court in our proposed findings of facts and conclusions of law to find. That's something ordinarily is submitted after the trial or at the time of trial. A lot of time passed between the issuance of the first decision and presumably your submission of those proposed findings. Right. At any time prior to that time, did you tell the Court this bench trial is not necessary? No, because I think the bench trial was necessary in any case. Did I move for summary judgment? No, summary judgment was not moved on before the case. But even if it was, it would have been denied on the same grounds as his conclusions of law after the trial. So we would have the exact same question before the Court, whether it was on the denial of a summary judgment motion or the findings and conclusions of law after the trial. You're telling Judge Clifton there would have been a trial on damages regardless if he determined that this is law in the case? Well, there was a trial on damages as well as a trial on the other two letters that were not explicitly addressed by this Court in the first appeal. So they couch it as a judicial estoppel, but in order for that to apply, we would have had to take in two distinctly opposite positions. For example, the cases they cite, it's trust property or it's not trust property. We did not do anything of that kind. We maintained from day one that these letters were ERISA letters. Well, it's plainly not a judicial estoppel, but it's not so clear to me that you maintained from day one or day one after receipt of the first Court of Appeals decision that this issue was foreclosed by the Court of Appeals decision. And I have to say, as I look at the Court of Appeals decision, I can read it that way, but I can read it another way. It's apparent that the Hawaiian wants to read it the other way and that Judge King did read it the other way. And if it's not so clear to me that you told Judge King he shouldn't read it the other way, that suggests that maybe he wasn't unreasonable in going forward in the way that he did. Well, it may not have been unreasonable for him to go forward with the trial and take evidence on what these letters meant. But even if you granted that, there was no evidence presented that these letters meant anything but what the Ninth Circuit said the first time around. I think there was. I mean, certainly the position that Judge King ultimately reached was that these letters were not requests for specific information, such as, what's the amount in my fund or what will the calculation be? They were an effort to express a position as to how the numbers should be calculated. And in fact, at least one of the letters offers up information or volunteers, I'll give you information to tell you how it should be calculated, suggesting that the author of the letter wasn't in doubt about the information, rather was expressing a position that the Hawaiian would adopt. I don't think that's quite correct, because for Mr. Bell to have that knowledge, he would have had to have some information that this was his retirement amount and nothing in the record. Everything that Hawaiian had sent him up to September of 1997 said this is preliminary. We will adjust it. Your final will be different, but we will do the final calculations. And they just did not do that. And it is clear that they could do it, because in 1993, there's an internal calculation of his final retirement benefit, and nothing was done about it. It's clear that he could do it, too, if it was known what's going to be added into the base from which you calculate. And this is where you get into the issues of whether — I've now forgotten the term. There's one term in particular used that I didn't understand, but I'm getting adjusted to that, that whether or not that gets counted as part of his compensation for purposes of calculating retirement benefits. And the main thrust of his letters appeared to be to express his position that these things are supposed to be included in the calculation, which is going to result in a higher retirement benefit. Well, I think you have to read that as his suggestion that this is the way I think, but I want to know what you're doing. And that was never given to him. So he could have said anything he wanted to, but it didn't really matter until Hawaiian gave him the final calculation of what his retirement benefits were. He did not know. This was not a request to recalculate his retirement benefit. This was a request to know in the first instance what his retirement benefits were, and it is very clear that that wasn't done until September 29, 1997. And then only in response finally to an attorney letter, as opposed to one from Mr. Bell himself. And that's what's inexcusable. That's what the ERISA penalties are directed to, this kind of unexplained, we don't care. And that's very illustrative because there's never been an explanation as to why there was this delay. It's completely unexplained. And that's what makes it so bad. Well, at least at the front end, it seems to me that there's a plain explanation, and that is that the two sides had different points of view as to what gets calculated or what gets included in the base for calculating retirement pay. I mean, his letters seem to make that clear. In particular, the October 27 letter is very detailed, laying out numbers and so on and so forth. He's prepared to offer up the information. He knows what the component parts are, but Hawaiian hasn't agreed that all the component parts that he thinks should be included, Hawaiian hasn't accepted that position. Now, they have put him off in an unusually unenlightening manner. There's no question about that. But there's not a whole lot of doubt as to what it is the parties are potentially disagreeing about, is there? Well, there is. I mean, he does not know. The fundamental crux of this thing is he does not know what his retirement benefits are, and he's asking for that information, and Hawaiian is not giving him that information and doesn't give him that information for seven years or five years after he writes his first letter. Never. How does the penalty thing work? Is it $100 a day until he gets the information? It's 30 days. The company has 30 days from the time the letter is written. From then on, the penalty kicks in until the information is provided. Up to $100 a day? Up to $100. I think CFR revised it up to $110 a day, but the statute says $100 a day in the court's discretion. So you can have a ---- So $100 a day for seven years is what your ---- is the amount in controversy possibly? Five years. And the case law is that each letter triggers the penalty. And I think it is that way because you do not want employees or former employees, as in this case, to have to continuously seek the information that the law already requires the company to give. Has there been any effort at mediation in this case? Yes, there has been. If you do want to reserve some time, Mr. Asaki, to join. Five minutes. Okay. Thank you very much. Thank you. Morning. Good morning. Lisa Munger, Goodsell Anderson, Quinn and Stifel, appearing on behalf of Hawaiian Airlines. May it please the Court, Mr. Asaki is correct. We've been here before. And the last time we were here, this Court affirmed and remanded a summary judgment order that Judge King had issued. And the part that was remanded was with respect to these letters. And Judge King found, based on the argument of Mr. Asaki, that there was a fact, a question of fact, and that these letters could, viewed in context, be read to be requests for information. What evidence did you present to Judge King that it should be read that way? There was the evidence, in addition to the letters themselves. The letters were placed in context. And the letters were placed in context by putting the participants to those letters before the Court. The witness that was key to the 1992 letters was Ms. Iris Matsumoto. Ms. Matsumoto was, had been in charge of the pension issues when she was at Hawaiian Airlines at the time of trial. She was no longer with Hawaiian Airlines. She was with First Hawaiian Bank. So she had, at that time, no stake in the controversy. Ms. Matsumoto explained to the Court, and you can see from not only Mr. Asaki's questions, but the colloquy between the witness and Judge King, that when she received Captain Bell's letter, she understood that that letter was requesting a calculation of his retirement amount. She testified that she had done the preliminary calculation, and Captain Bell had. Eric, that's the part, I mean, this case, it's a little tricky because the language that was used isn't, I mean, it's not all that clear, except that when you're asking for a calculation, isn't that asking for information as opposed to asking for payment? And if she understood it to be asking for a calculation, which she wasn't providing him, isn't she failing to give him information that he's entitled to under Section 1025A? No. What she was reques- Wait, why, answer that question. And let me answer that. Why is that not, when you ask for, because there's disputes, right? There's disputes as to what's going to go into the calculation. So he wants to know, where are you on this dispute? What are you going to include? What are you not going to include? And then, assuming it doesn't go his way, maybe he sues you or he goes to the union or whatever. But assuming you're going to give him the full thing, he can calculate his retirement benefits and how he's going to live for the rest of the life, which is the purpose of this statute. She had done the calculation. He was receiving his retirement check each and every once. He knew the calculation that was made and the retirement benefits that were being paid. What he wanted was a change. That was a preliminary calculation. In Ms. Matsumoto's words, it was a preliminary calculation, and she acknowledged that she needed to provide him a final calculation, correct? Correct. However, the words preliminary and – I don't want the Court to have the impression that preliminary meant it was something that would be calculated, then there would be some calculation in the future and he wasn't being paid in the interim. He was being paid. I understand he was being paid. That's another reason why I interpret his letters as a request for information and not for payment, because he was being paid some amount according to the preliminary calculation, so he wasn't asking for that payment. He was asking for the information as to the recalculation and the premises for the recalculation. And the recalculation, the request for the recalculation is something that he was entitled to not under ERISA, but under the collective bargaining agreement that he had with the – through the Airline Pilots Association. And that was, as Judge King noted, the recalculation, the final calculation was something that was part and parcel of the collective bargaining agreement. So to the extent that he was requesting that, that is preempted on the Long v. Flying Tiger decision that we took up on our last appeal. This is not a case where he was asking for the summary plan description or he was asking for ERISA plan documents. What he was asking for was to have his calculation changed, which is part and parcel of the process under the collective bargaining agreement. And that's the – so that was – and that was, as Ms. Matsumoto testified, what was going on in the dialogue between herself and Mr. Bell. It was interpretations of the collective bargaining agreement and the pension plan. That raised the issue of how you accounted for the vacation time. That raised the issue of how you accounted for the bank time. Ginsburg. Show me where that is, that distinction is made in the record. It's in the courts. If I can refer you to the courts, find the courts order, which is record at exhib record 119, which was included within the plaintiff's – Tell me what page of the courts order. Okay. Page 14, finding number 8. It's part of the same request that Bell's benefits be recalculated in accordance with the interpretation of the plan and the Hawaiian Airlines contract with its pilots. And then the key finding is number 9, that his request for contractual interpretations or recalculation of his benefits are based on the collective bargaining agreement with Hawaiian Airlines and its pilots. Such claims, regardless of delays on the part of Hawaiian Airlines, are barred by Long Beach Flying Tiger Line. All right. Then I don't understand this part where he says it was part of the same request that Bell's benefits be recalculated in accordance with his interpretations of the plan. Isn't the plan, isn't that the ERISA plan? I'm sorry, Your Honor. Is it the plan, the ERISA plan? No. The plan is the – the plan is the pilots' – the plan that under which his benefits are calculated is one that is of a system board of adjustment subject to the Railway Labor Act that is exempt. It's not an ERISA plan. ERISA is preempted with respect to this particular plan. All right. So this – but the judge in this – I guess I'm not following you because the judge in this finding says there's the plan and there's the CBA. The plan? And the contract, the union contract. So two separate things. And the contract stuff is – it is preempted, but the plan stuff isn't, that this letter was requesting information on the plan. The only plan there is is one that subject – is one that arises from the collect – the only plan there is is the one that is subject to this part of the pilots' collective bargaining agreement. The interpretation of which is preempted by the – by the RLA. And then – and that – and then the evidence of that is that, as Ms. Matsumoto explained, they – she and Mr. Bell met and they've talked through the two issues that are driven by this collective bargaining agreement. The issue – the only issues here were vacation time, how you account for that, and bank time, which is a measure of hours that pilots fly and put in a bank and are paid for later. And those – so it was – those were the only issues remaining with respect to his recalculation, were issues arising under that plan. So – and the evidence presented to the court was that Ms. Matsumoto had this dialogue, she worked on these recalculations. That then went to the committee that is set up under the collective bargaining agreement, which consists of union members and management members who then review to make that determination. So I guess I'm not really following this aspect of your argument. My understanding of your argument is that – that the letters were not requests for information under Section 1025A. Isn't that your argument? That is my argument. But now you're making a different argument. You're saying, well, they were requests for information, but it was to – for information that isn't covered under ERISA. Correct. The – yes. My argument is that this is not a request for information that's required under ERISA. ERISA requires you to give your summary documents, your plan documents. This was not a request for those documents. This was a request for a change in benefits. But you're now conceding it was a request for information. It just wasn't, you're saying, for information that would come within 1025. I'm saying it was a – it was a – it was not – it was a request for information to the extent that Your Honor has characterized a request for a benefit calculation as information. My view is that this was not a request for plan information, which is what is required by ERISA. What this was a request for was for a recalculation of benefits based on the terms of a collective bargaining agreement, which is exempt from ERISA. I don't – I do not view this as a request for information. And as evidenced by that, if you look at Ms. Matsumoto's first letter, he said, let's get – let's recalculate. She wrote back and said, I'll be doing your recalculation. We'll get – I'll get back to you shortly. She didn't say, here's the information, here's the plan, here's the whatever. She was working on it. They then met and the evidence showed that they – he said, here, let me help you. Let me give you the information you need to recalculate my benefits. He did not in his second letter indicate that he needed any additional information from her. All he needed from her to do was to do a recalculation in accordance with his view of the collective bargaining agreement. So her instruction – so he provided her with detailed information as to why he felt that the vacation time and the bank time should be included in that calculation. The total benefits accrued calculation. To recalculate the benefits accrued. Okay, well, isn't that what 1025 says? That each administrator of an employee pension benefit plan shall furnish to any plan participant or beneficiary who so requests in writing a statement indicating on the basis of the latest available information the total benefits accrued. He – he had been provided something labeled preliminary on which he was being paid. He had that. What he wanted was something different. What he wanted was a reinterpretation of his benefits in order to receive a higher amount based on the inclusion of items for vacation time and bank time. He was not requesting information required under that section. And what Judge King relied on was her – the – Ms. Mott, contrary to counsel's suggestion that it was her understanding that that – that information was being requested, what Ms. Matsumoto testified at trial was that the – she understood that what he wanted was for her to recalculate his benefits. And they had meetings, they had discussions, and they had correspondence which memorialized that dialogue between them, which was to recalculate under the collective bargaining agreement. That was the – then time passed, and then as the – the Court is aware, the 1995 letters was not sent to – there was not evidence in the record that that was sent to Hawaiian Airlines, it was sent to Captain Thorstedt, and then the 1997 request does not request information at all and was certainly not raised below. The issue, Your Honor, that I think is critical here is that the – the prior decision of this Court asked that – remanded this for the matter to be viewed in context, and the context was presented to Judge King. Judge King had the opportunity to review to – that we don't have here today. Judge King had the opportunity to talk to, to ask his own questions of, and to observe the demeanor of the four witnesses who were involved in this benefits calculation, Captain Bell, Ms. Matsumoto, Captain Thorstedt, and Ms. Nonaka. Judge King had the opportunity to view and to understand the dialogue that went on between those parties back in 1992. Judge King had the opportunity to hear the context firsthand. And I think that while I can appreciate the Court viewing that something could be viewed as a request, and certainly that's the language of the last opinion, and as I understand Your Honor's remarks today, nonetheless, Judge King had the opportunity to see what the understanding of Hawaiian Airlines was, not what the understanding of Hawaiian Airlines should have been, not what Ms. Matsumoto should have thought, what she actually understood, what she actually did in response to what she actually understood. And the first subjective interpretation, is that dispositive of the issue? I don't know that it's dispositive of the issue, Your Honor. And I would think that the question, excuse me, I would just think that the issue would be whether a reasonable person would, how a reasonable person would interpret that letter. A reasonable person in Ms. Matsumoto's position, yes, I suppose I would agree with the Court that if she were in some way unreasonable or in some way arbitrary or vindictive or that there could be circumstances where her understanding would not be appropriate. But here, Ms. Matsumoto was a very credible witness, a very sincere witness, and there was no indication of unreasonableness on her part. Captain Bell is a very popular pilot. There was no ill will or bad motive or anything else. She genuinely was trying to respond to his request as she understood them. And I think that Judge King, as a finder, as a trier of fact, could find and did find that her understanding was not that he was requesting information under ERISA. That was not. Okay. The whole idea of taking evidence on this puzzles me a little bit, because it would seem to me the letters speak for themselves. And you would look at the four corners of the document. I don't know why extrinsic evidence would be admissible or necessary. Either the letters request information or they don't request information. And I don't know if it matters that she thinks it doesn't or she thinks it's a thank you note or a love letter or what she thinks it is. I mean, either the letter on its face requests information or the letter on its face doesn't request information. Your Honor, I don't – I think that the authorities look to the – what the – how clear the information requests are. This is a penal statute. It is applying a penalty. This isn't a matter that Captain Bell was injured. This is a penalty being applied to the company. And the cases do hold that you need to be clear in your request. I agree. I agree with you. If you look at the letter and if it's not clear, he loses without taking testimony and that's the end of it. If you look at the letter and you can't tell, you should win. I don't think he should be allowed to introduce evidence either. I just don't understand why we don't look at the letters. Well, I think we do look at the letters. But I think that the prior opinion of this Court was that we should look at the letter viewed in context. That's – and that is the – and that's what the trial did. That's what all of the pretrial, both not only our argument before the Court in our final pretrial conference, but also in our pretrial briefs, final pretrial statements, everyone accepted the premise as we understood this Court's order and I think as the cases would indicate is appropriate to look at the letters in context. And I think that you need to have it clear that the person was put on plain notice that some document under the plan was required. And this Matsumoto did not have that understanding. Viewed – because truly, Your Honor, if it were the case that the letters could be read up or down, then the remand would have been a finding that they were requests for information, not they could be viewed in context, but they were requests for information and an instruction to have trial with respect to what penalty, if any, was appropriate in the circumstances. That – so the proceedings below followed that. The direction of the Court. 30 seconds left. Your Honor, I don't – I think that that – if I can just sum up. The Court heard all the evidence. The Court had the opportunity to understand what these witnesses understood. This is a penal statute. This is not – they did not clearly understand that this was a request for plan information required by ERISA, as opposed to a recalculation of benefits in accordance with the collective bargaining agreement. And I would only add that Judge King, as all judges, tried to move things along and that there is no indication in this record that there is any bias on his part. Thank you very much, Ms. Munger. Mr. Iwasaki, you've got a few minutes left. Thank you, Your Honor. Under ERISA, plan beneficiaries are entitled to know where they stand under their plan. What are their benefits? What are their pension benefits? They're entitled to know what those calculations were. In this case, Mr. Bell was entitled to get what he received on September 29, 1997, which were the calculations of his retirement benefits 30 days after he wrote the letter back in June of 1992. He did not get that. That's why the penalty kicks in in this case. Well, to get to the final calculation, presumably the parties have to resolve the issues which Captain Bell himself was pursuing. I've looked up bank time was the phrase I couldn't remember. His claim was that excess bank time and vacation time should be included in the calculation. Is that correct? That's true, but to get to the final calculation, somehow the parties, in this case it means the retirement board, has to resolve whether or not that legal proposition is true. We're not talking about an arithmetic calculation. We're talking about the resolution of a legal issue. Is that correct? What goes into computing the numbers that go into that calculation, that is correct. And this case points that out, because it was not until 1997 when he received those calculations that he grieved and he went to the retirement board to dispute that. Now, and that's what the Railroad Labor Act preempts ERISA on, but it doesn't preempt ERISA on the matter of the penalty, which is before that. Because Hawaiian was not talking with Bell. My point is that there are two different kinds of requests here. There's a request for information, that is, what are the numbers, and there's a request for a resolution of the disputes or potential disputes that determine what gets added in. It doesn't seem to me that Captain Bell needed information in the form of what are the numbers because he was sending to Hawaiian the numbers himself. He knew what the numbers were. It appears to me that his request was for a resolution, that is, a determination of what gets included in the base for the calculation. Is there something in the ERISA statute that suggests that that kind of information or resolution is something that's required to be accomplished within 30 days? No. I think what you're saying is that Captain Bell knew what his retirement benefits were? No, he knew the numbers. He knew the number of hours or the excess bank hours and the vacation hours because he was sending that to them. What he thought of that position, but he needed to know what Hawaiian Airlines was going to do before he could dispute it. That's my point. He didn't need to know facts. He needed to know the legal position that will be taken by the retirement board because it wasn't ultimately Hawaiian's unilateral decision. But what if they agreed with him? What if the calculation said that? I mean, that's what he was asking for. I need to know what you're thinking. I need to know what your information is before I can do anything. See, that's the problem with what the district court did. It did not like the first opinion in this case. So it had to characterize those letters as something other than requests for information. And the way it did it is to say, oh, these are demands for payment because he's demanding a recalculation. But that's not what's going on. I asked Ms. Matsumoto on the October 92 letter. Now, you understand that this letter was in reference to your earlier promise made in 1990 that you would provide him with a final calculation of his retirement pay. Yes. What did you do in terms of preparing a final calculation when you got this letter? And she says, I cannot remember. Well, did she have the power to answer that question herself? No, because she had to work within Hawaiian Airlines, and she did. Well, it's not just Hawaiian Airlines, was it? And the pilots union. It was the retirement board that ultimately would make the decisions to what gets included. Because she had to pass her calculations by Mr. Thorstadt, which she did. She did that in 1993. And it fell through the cracks. So the effort, the effort to get that information to provide to Mr. Bell was actually done. They knew how to do it. And in 1997, when Ms. Nonaka actually did the whole nine yards, she only did it because an attorney wrote her that letter. Now, if Mr. Bell never wrote a letter and this fell all through the cracks, they would never, maybe on this record, have given him a final calculation. And the final calculation showed that they were underpaying him. Thank you, Mr. Saki. Mr. Munger, thank you. The case is started. You just submitted it. Good morning. Thank you. The next case is 0410185, United States v. Hoagland. Bonnie, this is 20 minutes on the calendar. We've adjusted the time to 10 minutes a side. Gentlemen, I don't know if you just heard that. We have it calendared for 20 minutes a side. It's been adjusted to 10 minutes per side. Okay. There we go. Good morning. Good morning, Your Honor. David Lee Partita representing Appellant Jeffrey Hoagland. Am I speaking into the microphone? Thank you. If you could keep your voice up, we'd appreciate it. Thank you.
judges: Thomas, Silverman, Clifton